UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
LANTIGUA SIME,

                                            Plaintiffs

-Against-                                                    **COMPLAINT**
                                                             JURY TRIAL DEMANDED

NEW YORK CITY DEPARTMENT OF EDUCATION,
BRENDAN LYONS *in his individual capacity*, and
MATTHEW GUTTMAN, *in his individual capacity*,

                                            Defendants
--------------------------------------------------------------------X

     Plaintiff,  LANTIGUA SIME, by his attorneys, LAW OFFICES OF AMBROSE

WOTORSON, alleges as follows:


I.       INTRODUCTION


     1.     This is an action pursuant to vindicate the civil rights of plaintiff. Plaintiff

contends that defendants altered the terms, conditions, and privileges of his employment on

account of his FMLA rights, his opposition to age discrimination against others and his speaking

out on matters of public concern.


II.     JURISDICTION


This Court has jurisdiction over this action under 29 U.S.C. 2601, et seq., and  42 U.S.C. Section

1983, and venue is proper as the enumerated acts and events occurred in this judicial district, and

upon information and belief, municipal defendants are headquartered in this judicial district.

III.     PARTIES

4.      LANTINGUA SIME (hereinafter, "plaintiff") who resides in Westchester County, New York hereby sues on his own behalf, and at all relevant times, he was employed with the Department of Education of the City of New York as an Assistant Principal.

5.      NEW YORK DEPARTMENT OF EDUCATION, (hereinafter, "NYCDOE") is an employer and a state actor for 42 U.S.C. Section 1983 purposes. This municipal defendant may sue and be sued, and its place of business is in New York County, New York. At all relevant times, NYCDOE employed plaintiff as Assistant Principal.

6.      NYCDOE is herein being sued for having violated plaintiff's rights through a pattern and practice of retaliation for speaking out on matters of public concern. As well, defendant, NYCDOE, at all relevant times, acted under color of state law and/or pursuant to its own practices, customs and policies.  NYCDOE's headquarters are in New York County.

7.      Similarly, BRENDAN LYONS and MATTHEW GUTTMAN, are Principal and Assistant Principal, respectively, of the High School of Graphic Communication Arts, (hereinafter, "Graphics H.S." or "Graphics"), 439 West 49TH Street, New York, NY 10010. At all relevant times, defendants acted under color of state law in retaliating against plaintiff on account of his opposition to age discrimination and on account of his protected speech activities

2

in  speaking out on matters of public concern. They both are herein sued in their individual capacities.

IV.     FACTUAL AVERMENTS

General Background and Lyon's perceived "modernization mandate

8.      Brendan Lyons, with the full imprimatur of NYCDOE, at the end of the 2011-2012 school year, expected to close down and to replace his assigned school, High School of Graphic Communication Arts, which specialized in graphic communications, with a new school that was to specialize in digital and web-based media. Lyons believed that he was tasked with modernizing his assigned school and taking it into the digital age.

9.       Upon information and belief, Lyons and people who assisted him in carrying out his perceived mandate of modernizing the school, specifically targeted and recruited teachers who were in their 20s and 30s to apply to the new school. Lyons specifically, and intentionally, discouraged and/or rejected applicants to the new school who were over the age of 40.

10.     Shortly before the new school was to open, the teacher's union won an injunction, and Lyons was forced to abandon his perceived "modernization" mandate. A livid Lyons reportedly became unruly and physically destructive upon learning of this injunction. However, Lyons vowed to continue his mandate, and to essentially flout the court's orders, and to engage in illegal behavior which plaintiff, Lantigua Sime, vehemently opposed, and spoke out against.

11.    In carrying out his perceived mandate, Lyons stopped at nothing in attempting to rid the school of teachers who were not in their 20s or early 30s, and who were not perceived to be a part of the new digital wave. This meant doling out unfair criticisms, giving U-ratings that were unwarranted. It also meant his closing programs that students had relied upon, his drastically lowering the population of students, his re-directing funds that were to be used for existing students and even participating in blatant acts of grade inflation in order to move students along, and eventually, out of the school's programs.

12.    However, plaintiff spoke out about age discrimination against others, and spoke out on matters of public concern relating to Lyon's illegal redirection of funds, resources, staff and materials away from existing programs towards this proposed new school.

13.    Plaintiff's speaking out was met with retaliatory animus in the form of harangues directly from Lyons, unfair criticisms, annual  U-ratings and more recently, pretextual and retaliatory disciplinary charges, which A.  Indeed, the terms, conditions and privileges of plaintiff's employment was eventually adversely affected because of his age, his opposition to age discrimination and his speaking out in matters of public concern in the following ways:

           a.   In the early fall of 2011, Brendan Lyons, a new
           Principal of Graphics H.S., asked plaintiff, an Assistant
           Principal of five (5) years at Graphics H.S., why Jacob
           "Jack" Kott, a social studies teacher in his late 60s, was still

the Coordinator of the Work-Based Learning program.
Lyons specifically told plaintiff that Kott seemed "too old to
be effective with student placement".

b.    Plaintiff immediately protested Lyon's suggestion and
responded that Kott had many industry connections, despite
his age, and that he was the best person for the position.

c.    Plaintiff also told Lyons that the program was doing
very well, that it had a high subscription rate and that it was
growing in the right direction.

d.    Lyons brushed plaintiff's comments aside, and angrily
suggested that Ebony Singleton, a CTE teacher under
plaintiff's supervision, who seemed to be in her late 20s' or
early 30s', take over the program.

e.    However, Singleton rejected a formal invitation from
Lyons to take over the program.

f.    Later in the fall, Lyons asked plaintiff about replacing
Kott with Peter Nieznalski, who was also considerably
younger than Kott. But, once again, plaintiff immediately

protested that that Kott was the best person for the job given his experience and industry contacts.

g.    Lyons gave plaintiff an icy-stare and did not specifically respond to his protest.

h.    Shortly thereafter, on or about mid-October of 2011, Lyons gave plaintiff a direct order to physically move the "CTE (special education) classrooms from the 5th floor to classrooms on the 3rd and 4th floor."

i.    Lyons denied plaintiff's request that custodial workers do the moving, and insisted that plaintiff, an Assistant Principal, do physical the moving.

j.    Plaintiff had never, in his Assistant Principal's role, been ordered to engage in any type manual labor.

k.    However, plaintiff severely injured himself in moving classrooms, and thereafter, needed umbilical hernia surgery, a serious medical condition.

l.    Plaintiff so informed Lyons about his need for surgery

as a result of moving classrooms, but Lyons asked plaintiff to move the proposed surgery dates twice, until February 2012.

m.   In mid-February 2012, plaintiff took a leave of absence in order to have pre-planned surgery on his stomach due to a serious medical condition.

n.   Plaintiff returned from his leave after only 3 weeks.

o.   Plaintiff explained to Lyons, upon his return to work after only 3 weeks, that his physicians had actually requested that he take off a full three (3) or more months within which to recuperate, and thus, he might have to occasionally come in late or be absent, intermittently, until his serious medical condition substantially improved.

p.   Lyons responded, in the presence of one or more other administrators that, "if you ever have pain, feel sick or unwell, you can just come in late or leave early."

q.   However, Lyons did not mention the FMLA by name, nor did he direct plaintiff to any FMLA posters or suggest

that plaintiff consult with any NYDOE human resources professionals, or complete any FMLA paperwork.  Further, Lyons did not indicate any specific direction that plaintiff was to inform him  (Lyons), when he was going to be late due vestigial pain or related illness.

r.   Plaintiff observed that Lyon was consumed with opening this new school, and was determined to make space for the new school and to have his preferred teachers. However, he had to persuade existing personnel to also assist in planning the new school and to help the concept to get off to a start.  Indeed, at March 2012 meeting Lyons announced to his administrators that "[they] have to lie to them (existing teachers); tell them its going to be fun and that they will never have another opportunity like this, so that they get on board."

s.   In fact, Lyons had no intention of hiring teachers who were over the age of 40, or very many teachers who were already tenured. On more than one occasion beginning in late 2011, Lyons specifically complained to plaintiff that older teachers were "…investments on diminishing returns."

t.    Moreover, in the early Spring of 2012, Lyons announced in plaintiff's presence and in the presence of one or more Assistant Principals, that he wanted new, more energetic teachers who would be "afraid" to lose their jobs, as opposed to "older" and "tenured" teachers who did not seem to have any fear of losing their jobs. Lyons went on to specifically state in the same breath, that he wanted to eliminate teachers who were older, and whom he believed were mostly tenured.

v.    Not surprisingly, by this time Lyons had begun – over plaintiff's objections -- to assign much of the responsibilities of the school's Work-Based Learning program away from Jacob Kott who was in his late 60s, to Peter Nieznalski, who was considerably younger, and did not have any experience with the program.

w.    Lyons brought up the subject of eliminating older teachers again in the late Spring, and this time, specifically identified individuals whom he believed should be U-rated and dismissed specifically because they were older, tenured and without "fear".

x.    Lyons requested that plaintiff participate in this scheme to U-rate individuals with a view towards creating a record of incompetence for them, but plaintiff told him that he would not do so.

y.    Plaintiff specifically told Lyons that many of these teachers could be developed into teacher leaders, but Lyons responded that he said he was would rather hire new teachers who would "listen and follow orders."

z.    Lyons also stated that those teachers needed to get the message that they were not "on the bus." He further told plaintiff and other APs, that they should not, "…at this point, try to help them (the targeted teachers), but that you should just U-rate them so I can get rid of them."

aa.   After this meeting, plaintiff specifically told Lyons that what he planned to do was illegal and discriminatory, that he could not condone it and that he would not participate in unfairly targeting any teachers. He also reminded Lyons that some teachers had successfully sued the prior Principal for age discrimination. Lyons angrily replied that he was aware of the prior age discrimination lawsuit. Plaintiff also spoke

with another Assistant Principal about Lyon's discriminatory scheme.

bb.  Beginning in late April 2012, plaintiff was tasked to begin planning the CTE and Special Education components for Lyon's  "new school" during the workday.  However, plaintiff was not permitted, as per NYDOE directives, to work on the new school during the regular workday.

cc.  Moreover, plaintiff observed that Lyons had begun to divert funds, time and materials away from existing programs, and to take other measures to hasten the demise of Graphics Communications H.S., all in an effort to create "space" for the new school and to get it ready to open.

dd.  When plaintiff, spoke out to Lyons, and protested that NYDOE directives forbade re-directing funds, materials, time and staff away from existing programs to non-existing programs, Lyons said to plaintiff,  "well Sime, you need to decide if you're on the bus or off the bus." When plaintiff stated that focus needed to be on the current student population and existing programs, Lyons retorted,  "...its clear you're not on the bus."

ee.   Plaintiff promptly complained to his district supervisor and others, in late April 2012, to the effect that Lyons was redirecting funds and materials away from existing programs, and re-directing staff towards programs for the new school that apparently was being assigned to Lyons.

ff.   Shortly thereafter, Lyons called the administrative team to an emergency meeting and during the meeting began to scream  that, "someone complained and that's not how we do things around here.  What happens in this school stays in this school."  Lyons angrily stated that the whistleblower was "... someone from the 'admin team' ".

gg.  Plaintiff was on the "admin team", and to his knowledge, he was the only member of the team who openly opposed Lyon's efforts to redirect funds and materials away from existing programs towards future programs in the new school that was being assigned to Lyons.

hh.  Thereafter, Lyons began a pattern of assigning plaintiff to tasks that were not consonant with his status as an Assistant Principal.

jj.   For example, plaintiff was tasked to stand on the corner
of 49th street and 9th Avenue for two consecutive days and
to disburse any students who congregated there, so as to
prevent any gang violence.

kk.  Notably, Lyons was aware that plaintiff  was still
recovering from his umbilical hernia surgery at the time.

ll.   On June 6, 2012, a teacher working with Lyons on new
school plan, approached plaintiff told him that his office was
currently being used for interviews. Plaintiff had not
previously been informed of this.

mm.        The next day, plaintiff found that all of his
personal and professional items were in boxes. Plaintiff
asked, several times over, why his belongings had been
boxed, but nobody in the administration, including Lyon's
assistant seemed to know, or be able to explain why.

nn.  On the final week of June 2012, plaintiff received, for
the first time in his career, an overall "unsatisfactory" rating
for the year. When plaintiff confronted Lyons about his

unsatisfactory annual rating, Lyons told him that he a

received an unsatisfactory rating solely because he

(plaintiff), had 38 late arrivals after his surgery.

oo.  Also, in the final week of June 2012, Lyons, upon

information and belief, fabricated a story that he told to the

NYCDOE. Lyons falsely claimed that his Assistant

Principal, Matthew Guttman, had told him that plaintiff ran a

real estate business and had entered into real estate

transactions with a supervisee, Jacob "Jack" Kott. NYCDOE

prohibits such transactions, and engaging in such

transactions will result in disciplinary charges seeking

termination of employment, amongst other things.

pp.  The allegation was utterly false. Lyons knew or had

reason to know it was false. Moreover, Matthew Guttman

had no knowledge that plaintiff had been involved in any

real estate transactions with Kott. Instead, upon information

and belief, Lyons and Guttman conspired to fabricate a story

and to bring pretextual charges against plaintiff, in part

because of his opposition to age discrimination and Lyon's

illegal re-direction of public funds.

qq.  In any event, Lyons refused to reverse plaintiff's U

rating when plaintiff complained that it seemed that he was

being punished, in part, because of his surgery, since his

lateness's were solely caused by his moving slower as a

result of lingering pain each morning from his umbilical

hernia surgery.

rr.   Upon information and belief, plaintiffs was also being

punished because of his animus towards his vociferous

opposition to Lyon's illegal redirection of funds, resources,

staff and materials away from existing programs towards the

new school which Lyons hoped to open, and his prior

opposition to age discrimination. To Lyons, plaintiff had

demonstrated that he was not "on the bus".

ss.   Upon plaintiff's return to his office in September 2012,

after the summer break, he found that all of his belongings

had been removed.

tt.   Ms. Tutti Touray, a new Assistant Principal in her late

20s to early 30s, told plaintiff that the office was now hers,

as per the Principal,  Lyons.  Plaintiff had worked in the

building for the previous thirteen (13) years, and had

occupied the same office in question for the previous six (6) school years.

uu.  Plaintiff was not assigned to *any* office, and he was not told of any location where he could work or even place his personal items.  Instead, virtually all of Lyon's new hires – primarily in their 20s and early 30s -- were given space and other offices in the building. Plaintiff was professionally homeless.

vv.  Upon information and belief, Lyons did not want plaintiff at the school because: (1) he was not a 20 or 30 something new hire who "feared for his job";
(2) plaintiff did not fit in with the new "digital" theme of the school; because plaintiff was not "..not on the bus,"  and had spoken out on matters concern of public concern, such as Lyon's illegal age discrimination against other teachers, and Lyon's redirection of funds, resources, staff and materials away from existing programs towards the new school.

ww. Indeed, almost immediately from the beginning of the 2012-2013 school year, Lyons exhibited disdain towards plaintiff.  Examples of this include, but are not limited to:

(1) Lyons specifically telling plaintiff, "I don't want you here;" (2) Lyons being slow to respond to plaintiff's emails, or not responding to them at all; (3) Lyon's issuing directives to plaintiff at that last minute so that it would be impossible for plaintiff to meet already impending deadlines; (4) Lyons not including plaintiff in administrative team meetings; (4) Lyons giving plaintiff "make-work" assignments; (5) Lyons assigning roles to plaintiff that he had no training or experience in, such as "security" and "physical education; (6) Lyons assigning to plaintiff certain roles and responsibilities without informing plaintiff, and without informing staff who plaintiff was expected to supervise or to interface with; (7) Lyons inserting a false disciplinary letter(s) to plaintiff's personnel file stating that he had been absent, when, in fact, plaintiff had not been absent at all; (8) Lyon's giving plaintiff three different job descriptions, yet failing to ever meet with plaintiff and never bothering to even monitor or to observe plaintiff's work.

xx.  On or about February 2013, NYC questioned plaintiff about Lyon's and Guttman's false charges. During the interrogation, plaintiff  formally complained to the NYCDOE about (1) Lyon's pattern of age discrimination

against other teachers; (2) Lyon's segregation of students

based on attendance and failure rates without parental

consent or other proper; and (3) Lyon's efforts to redirect

funds and materials away from existing programs towards

future programs in a new school, which was being assigned

to Lyons; and (4) Lyon's retaliatory towards him,

yy.  A Senior investigator with the Special Commission of

Investigations for the NYCDOE, Ron Vance, eventually

told plaintiff that Lyons had a right to hire, fire and to U-rate

whomever he wanted.  However, investigator Vance did also

tell plaintiff that he would look into plaintiff's other

allegations of misconduct against Lyons, in particular, the

allegations pertaining to funding.  Several weeks later, when

plaintiff inquired about the status of his allegations, Vance,

for the first time, stated that,  "We are not looking into that."

zz.  Vance did not give any further explanation why there

would be no investigation into plaintiff's allegations of age

discrimination, and segregation of students, nor did he direct

plaintiff to any other investigators or any other investigative

body.

aaa. Plaintiff is now subject to termination, because of

pretextual unsatisfactory ratings that are also retaliatory in

nature. Indeed, plaintiff is barred from seeking any

promotions, any lateral transfers or participating in any per

session activities, solely as the result of his overall U ratings

for the 2011-2012 and 2012-2013 school years. This is a

substantial financial loss for plaintiff.


bbb.  Moreover, on or about March 3, 2014 plaintiff was

served with pretextual disciplinary charges, which false

claimed in that plaintiff had engaged in a pattern of

misconduct between 2011 and 2014. But plaintiff's protected

speech activities, and his vociferous opposition to blatant age

discrimination, he would not have been subjected to these

charges and other retaliatory behavior.


14.    Plaintiff's rights to employment free of unequal treatment, without any rational

basis, and free speech are clearly established, and reasonable persons employed by New York

City Department of Education are aware of these rights, or have reasons to be so aware of these

rights.


15.    As a further proximate result of defendants' illegal acts towards plaintiff, plaintiff

will suffer a loss of earnings, bonuses and other employment benefits.

16.     As a further proximate result of defendants' illegal actions towards plaintiff, plaintiff has suffered impairment and damage to plaintiff's good names and reputations.

17.     As a further proximate result of defendants' illegal actions towards plaintiff, plaintiff has suffered mental anguish and emotional injuries.

18.     As a further proximate result of defendants' illegal actions towards plaintiff, plaintiff has been unable to ameliorate his employment situation, despite his best efforts to do so.

19.     Individual defendant's illegal actions were willful, outrageous and were malicious, and were intended to injure plaintiff, and were done with reckless indifference to plaintiff's protected rights, entitling plaintiff to punitive damages, as against the individual defendants(s)

V.     CAUSES OF ACTION

FIRST CAUSE OF ACTION – FAMILY MEDICAL LEAVE ACT (*All defendants*)

20.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

21.     Defendants willfully violated 29 U.S.C. Section 2601, et seq., known as the

Family Medical Leave Act, when plaintiff was penalized, by way of an annual Unsatisfactory rating that was the result of plaintiff's intermittent lateness's. Plaintiff was intermittently late due to a serious medical condition which defendants were well aware of. In fact, defendants, through Lyons, encouraged plaintiff to come in later than normal on days when he had vestigial pain or illnesses, related to his serious medical condition. Defendants willfully and intentionally violated plaintiff's FMLA rights in retaliation for plaintiff's opposition to age discrimination and his speaking out in matters of public concern.

SECOND CAUSE OF ACTION – PROTECTED SPEECH (*All defendants*)

22.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

23.     Defendants punished plaintiff, also because he spoke on separate matters of public concern relating to blatant age discrimination against others and Lyon's illegal redirection of funds, resources, staff and materials away from existing programs towards a proposed new school. Thus, defendants violated the First Amendment of the United States Constitution, as made actionable by 42 U.S.C. Section 1983.

THIRD CAUSE OF ACTION – DISABILITY (Against Lyons, individually, only).

24.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

25.     Defendant willfully violated the New York City Human Rights Law, when plaintiff was penalized, by way of an annual Unsatisfactory rating that was the result of plaintiff's intermittent lateness's. Plaintiff was intermittently late due to a serious medical condition which defendants were well aware of. In fact, defendants, through Lyons, encouraged plaintiff to come in later than normal on days when he had vestigial pain or illnesses, related to his serious medical condition. Defendants willfully and intentionally violated plaintiff's disability rights in retaliation for plaintiff's opposition to age discrimination and his speaking out in matters of public concern.

FOURTH CAUSE OF ACTION – RETALIATION (Against Lyons, individually, only).

26.     Plaintiff hereby repeats and realleges each allegation in each numbered paragraph above.

27.     Defendants punished plaintiff, also because he opposed and spoke out against, defendants' blatant attempts to discriminate against other employees because of their ages.

VI.     PRAYER FOR RELIEF:

WHEREFORE, plaintiff pray that this Court grant to him judgment containing the following relief:

a.      An award of damages to be determined at the time of trial to compensate plaintiff

for lost pay and benefits, mental anguish, humiliation, embarrassment, and emotional injuries;

b.      An award of punitive (as against the individual defendant(s)) to be determined at

the time of trial as against any individual defendant(s);

c.      An award of reasonable attorney fees and the costs of this action and,

d.      Such other and further relief as this Court may deem just and proper; and

e.      Any other equitable relief available, including an injunction against the adverse

actions complained of herein.

Dated:  New York, New York
            June 20, 2015

                        Respectfully Submitted,
                        Law Offices of Ambrose Wotorson

                        By_____S//_____
                        Ambrose W. Wotorson (AWW—2412)
                        225 Broadway, 41st Floor
                        New York, New York 10007
                        646-242-3227 (T)
                        Loaww1650@aol.com